*NOT FOR PUBLICATION*

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**DUANE E. ANDERSON, and JEANNE C. ANDERSON,**<br><br>Debtors. | Case No. **21-10115-BPH** |
| **DUANE E. ANDERSON, and JEANNE C. ANDERSON,**<br><br>Plaintiffs.<br><br>-vs-<br><br>**STATE OF MONTANA and MONTANA DEPT. OF NATURAL RESOURCES AND CONSERVATION,**<br><br>Defendants. | Adv. No. **21-ap-01005-BPH** |

## MEMORANDUM OF DECISION

In this adversary proceeding, on January 14, 2022, the Plaintiffs Duane E. Anderson and Jeanne C. Anderson ("Andersons") filed a "Motion for Summary Judgment" at ECF No. 36 and a "Supporting Memorandum of Law" at ECF No. 37 (collectively "Andersons' Motion"). The State of Montana filed a Response to Andersons' Motion on January 28, 2022, at ECF No. 49 ("State Response"). The Department of Natural Resources and Conservation ("DNRC") filed a Response to Andersons' Motion on January 28, 2022, at ECF No. 51 ("DNRC Response"). DNRC also filed a Cross Motion for Summary Judgment at ECF No. 52 ("DNRC Cross Motion"). The Andersons filed a Response to the DNRC Cross Motion at ECF No. 57 ("Andersons' Response to DNRC's Cross Motion").

### I.  Background and Summary of Arguments

Prior to filing their bankruptcy petition, the Andersons leased certain tracts from DNRC for agricultural and grazing purposes. The specific leases included Montana state leases Nos. 447, 449, 4351 and 6168 ("State Leases"). DNRC alleges that effective April 1, 2020, the State

Leases were cancelled due to default in payment of annual rentals by the Andersons. The Andersons challenged DNRC's termination of the leases. After informal efforts failed, Andersons filed a complaint alleging the four leases between Andersons and DNRC were unlawfully terminated by DNRC. Complaint, ¶¶ 1-3, Mar. 18, 2021, Mont. First Jud. Dist. Ct., CDV 2021-278 ("State Court Litigation"). The causes of action asserted in the Complaint include breach of contract, injunctive, and declaratory relief. *Id*. Specifically, Andersons requested injunctive relief to enjoin DNRC from taking any action to lease the subject land; and a declaration that the State Leases are valid and should be reinstated. In addition to this relief, Andersons sought damages and attorney fees. The State Court Litigation was in its infancy when Andersons filed their bankruptcy petition.

This adversary proceeding was initiated when the Andersons removed the State Court Litigation to this Court pursuant to 28 U.S.C. 1452(a), 28 U.S.C. §§ 157(b)(2)(B), (O), and 1334(b). If the leases are determined to be valid, Andersons' interest in the leases constitutes property of the estate under 11 U.S.C. § 541. In essence, the parties seek this Court's determination of their interests in the State Leases, a determination that is dependent on the validity of the prepetition termination of the same by the DNRC.

### A. Andersons' Motion, State and DNRC Responses

Andersons' Motion requests summary judgment on two alternative grounds. First, Andersons argue that the payment was not due April 1, 2020, but rather was due either by November 15, 2020, or alternatively December 31, 2020. Conversely, the State Response and DNRC Response both argue that the State Lease payment was due, at the latest, by April 1, 2020. The State Response and DNRC Response both request the Court deny the Andersons' Motion.

### B. DNRC Cross Motion

In its cross motion, DNRC restates its opposition to Andersons' Motion as an affirmative request for judgment in its favor, arguing the State Lease payment was due on or before April 1, 2020. To support its position, DNRC relies on the Declarations of Kelly Motichka and Lieutenant Governor Kristen Juras.[1] DNRC also refers to the State Leases, Assignment Forms,[2] CRP Contracts,[3] and Cash Lease Agreements[4] as evidence that the grazing lease payment was due on or before April 1, 2020.

---

[1] "Declaration of Kelly Motichka" ECF No. 52-3 ("Motichka Declaration"); "Declaration of Kristen Juras, Lieutenant Governor of the State of Montana" 52-2 ("Juras Declaration").
[2] ECF No. 17-5 (Assignment Forms for State Leases Nos. 447, 449, 4351, and 6168).
[3] Ex. 5 of DNRC Cross Motion at ECF No. 52-8 (CRP Contract Nos. 11113, 11114, 11116, and 11117).
[4] Ex. 9 of DNRC Cross Motion at ECF No. 52-12 ("Cash Lease Agreements").

### C. Andersons' Response to DNRC's Cross Motion

Andersons' Response to DNRC's Cross Motion provides three reasons why the payment was not due on or before April 1, 2020.[5] First, Andersons argue that because three of the four leases (Lease Nos. 449, 4351, 6168) are subject to Conservation Reserve Program Cash Lease Agreements[6] ("Cash Lease Agreements") and the cash lease payments are due "on or before November 15th of each year" then the grazing lease payments in the State Leases also became due by November 15, 2020.

Second, Andersons argue that, despite DNRC's failure to approve an assignment of the leases to the United States Department of Agriculture ("USDA"), the USDA's recording and perfection of the assignment of the State Leases as required by Mont. Code Ann. § 77-6-401 – 404, and Admin. R. Mont. § 36.25.122, created "effective" assignments of the leases to the USDA. Under this interpretation, the United States was a lessee and, pursuant to Mont. Code Ann. § 77-6-506(1), the annual rental payment on all four State Leases was due on December 31, 2020.

Finally, Andersons argue that all four State Leases "involved" the United States as set forth in Mont. Code Ann. § 77-6-506(1) and therefore, the annual rental payment on all four State Leases was due on December 31, 2020.

Despite Andersons and DNRC's voluminous briefing, in essence both Andersons and DNRC seek partial summary judgment on whether the grazing lease payment under the State Leases was due on or before April 1, 2020, or alternatively, November 15, or December 31, 2020.

### II. Summary Judgment Standard

Pursuant to Civil Rule 56[7] and Rule 7056, to prevail on a motion for summary judgment the movant must show that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. The presiding court "may not weigh evidence in resolving such motions, but rather determines only whether a material factual dispute remains for trial." *In re Wank*, 505 B.R. 878, 886 (B.A.P. 9th Cir. 2014). A dispute is genuine if "there is evidence for a reasonable fact finder to hold in favor of the non-moving party, and the fact is 'material' if it might affect the outcome of the case." *Id.* The moving party bears the burden to establish the absence of genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* If the moving party satisfies its burden, the non-moving party may prevail if the non-moving party, "affirmatively show[s] that a material issue of fact remains in dispute." *In re*

---

[5] The Andersons objected to the use of the Juras Declaration for purposes of summary judgment. The Andersons object to the Juras Declaration as hearsay, and because it presents legal conclusions. The Court has reached its own conclusions without resort to the Juras Declaration.
[6] Ex. 9 of DNRC Cross Motion at ECF No. 52-12 ("Cash Lease Agreements").
[7] Unless otherwise indicated, all chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all Civil Rule references are to the Federal Rules of Civil Procedure, Rules 1–88.

*Franz*, 532 B.R. 792, 807 (Bankr. D. Mont. 2015). The deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party. *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015).

Even if there is no genuine dispute of material facts, to prevail, the moving party must be entitled to judgment as a matter of law. Civil Rule 56. The moving party is entitled to judgment as a matter of law when the nonmoving party has failed to make a sufficient showing on an essential element of its case of which it carries the burden of proof. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986).

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001). While this requires the trial court to grant or deny each competing motion, the trial court is free to do so by issuing a single order granting one and denying the other. *See Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015). The trial court is afforded creative liberty to "organize its discussion of the cross-motions," so long as it "rule[s] on each party's motion on an individual and separate basis, determining, for each side whether a judgment may be entered in accordance with the [Civil] Rule 56 standard." *Id.*

### III. Uncontroverted Material Facts

While the briefing associated with this matter presents a detailed account of the factual events leading up to and surrounding the cancellation of the State Leases, ultimately, the parties seek a determination of a legal question: when was the grazing lease payment due? The arguments presented in the briefing require the resolution of two questions of law necessary to determining the grazing lease payment due date. First, whether the Cash Lease Agreements altered the grazing lease payment due date under the State Leases from April 1, 2020, to November 15, 2020. Alternatively, whether the State Leases constitute leases of which "the United States is a lessee" or which "involved the United States as a lessee" under Mont. Code Ann. 77-6-506(1) consequently altering the grazing lease payment due date of the State Leases from April 1, 2020, to December 31, 2020. For purposes of summary judgment and resolution of these narrow issues, the following facts are not controverted:

1. DNRC, as lessor, and Andersons, as lessees, were parties to State Leases Nos. 447, 449, 4351, and 6158.[8]

---

[8] Ex. 1 of DNRC Cross Motion at ECF No. 52-4 (Lease 447); Ex. 2 of DNRC Cross Motion at ECF No. 52-5 (Lease 449); Ex. 3 of DNRC Cross Motion at ECF No. 52-6 (Lease 4351); and Ex. 4 of DNRC Cross Motion at ECF No. 52-7 (Lease 6168).

2. On December 11, 1997, Andersons and the United States Department of Agriculture ("USDA") executed "Affidavits of Assignment of State Leases" ("Assignment Forms") with regard to the State Leases.[9]

3. The Assignment Forms were executed by Andersons and USDA in connection with mortgages entered between Plaintiffs, as mortgagors, and USDA, as mortgagee.[10]

4. The Assignment Forms were not executed, signed, dated, or approved by DNRC.[11]

5. Andersons and the USDA's Commodity Credit Corporation entered into Conservation Reserve Program Contracts ("CRP Contracts") whereby approximately 1,695 acres of the acreage designated as agricultural under State Leases 449, 4351 and 6182 was placed into the Conservation Reserve Program.[12]

6. Andersons and DNRC entered into Conservation Reserve Program Cash Lease Agreements ("Cash Lease Agreements") for State Leases 449, 4351 and 6182.[13]

7. The Cash Lease Agreements provide for an annual cash rental payment from Andersons to DNRC for the agricultural acreage placed into CRP. The annual cash rental for CRP acres is due November 15 each year.[14]

Notably, these "facts" are rooted in specific documents. Although the parties have each asserted that genuine issues of material fact preclude granting the other party summary judgment, the contracts and documents themselves provide uncontroverted facts. This leaves the Court to decide, based on these uncontroverted facts, whether Andersons or DNRC are entitled to partial summary judgment as a matter of law. Civil Rule 56.

## IV. Analysis

### A. The Cash Lease Agreements do not Alter the Grazing Lease Payment Due Date under the State Leases.

"When a bankruptcy court adjudicates a dispute arising from a contract claim, it must apply state law unless the bankruptcy code provides otherwise." *In re New England Fish Co.*, 749 F.2d 1277, 1280-81 (9th Cir. 1984) (internal citations omitted). This case arises from

---

[9] ECF No. 17-5 (Assignment Forms for State Leases Nos. 447, 449, 4351, and 6168).
[10] ECF No. 17-7, pp. 37-60, 115-167 (Security Agreements and Mortgages identifying State Leases as collateral).
[11] ECF No. 17-5 (Assignment Forms for State Leases 447, 449, 4351, and 6168).
[12] Ex. 5 of DNRC Cross Motion at ECF No. 52-8 (CRP Contract Nos. 11113, 11114, 11116, and 11117).
[13] Ex. 9 of DNRC Cross Motion at ECF No. 52-12 ("Cash Lease Agreements").
[14] Ex. 9 of DNRC Cross Motion at ECF No. 52-12 ("Cash Lease Agreements").

contracts to lease real estate located in Montana and all parties are either Montana state entities or residents of Montana. Therefore, this Court will apply Montana law to interpret the contracts and documents. Mont. Code Ann. § 28-3-102. Under Montana law, the construction and interpretation of a contract is a question of law for the court to decide. *Ophus v. Fritz*, 11 P.3d 1192, 1195 (Mont. 2000).

Analysis of a contract begins with its plain language. Mont. Code Ann. § 28-3-401. That means, "where the language of an agreement is clear and unambiguous, and as a result, susceptible to only one interpretation, the court's duty is to apply the language as written." *Rich v. Ellison*, 174 P.3d 491, 495 (Mont. 2007). It follows, "[a]n ambiguity's existence must be determined on an objective basis." *Wicklund v. Sundheim*, 367 P.3d 403, 408 (Mont. 2016). Moreover, "a conclusion of ambiguity is not compelled by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation." *Mary J. Baker Revocable Trust*, 164 P.3d 851, 857 (Mont. 2007). Stated another way, "[a]mbiguity does not exist just because a claimant says so, but only when the contract taken as a whole in its wording or phraseology is reasonably subject to two interpretations." *Williams v. Insurance Co. of North America*, 434 P.2d 395, 397 (Mont. 1967).

Contracts should be construed holistically. Mont. Code Ann. § 28-3-202 ("The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other."). Further, "courts are without authority to erase components from unambiguous contract provisions." *Corwin v. Bd. of Public Educ.*, 898 P.2d 1227, 1231 (Mont. 1995). Certain provisions of the contract are not to be read in isolation. *In re Marriage of Oehlke*, 46 P.3d 49, 54 (Mont. 2002). In sum, "the contract must be viewed from beginning to end." *Stowers v. Community Medical Center, Inc.*, 172 P.3d 1252, 1255 (Mont. 2007). Similarly, when there are several contracts relating to the same matters between the same parties, the contracts are to be taken together. Mont. Code Ann. § 28-3-203. *See also Rumph v. Dale Edwards, Inc.*, 600 P.2d 163, 168 (Mont. 1979) (where a closely related lease agreement and lease rider were read as one contract.).

A court's interpretation of a contract should be consistent with the parties' intentions at the time the contract was entered. Mont. Code Ann. § 28-3-301. Contracts are to be interpreted so "as to give effect to the mutual intention of the parties as it existed at the time of contracting[.]" *Id.* (provided, however, that the mutual intention is "ascertainable and lawful."). That said, "when a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible[.]" Mont. Code Ann. § 28-3-303. In interpreting a written contract, the intention of the parties must be ascertained, first and foremost from the writing alone, taken as a whole if possible, resorting to extrinsic evidence in aid of discovering the parties' intent only when the contract appears on its face to be ambiguous or uncertain in this regard. *Morning Star Enter. v. R.H. Grover, Inc.*, 805 P.2d 553, 557 (Mont. 1991).

The State Leases and Cash Lease Agreements must be read as one contract and interpreted holistically to give effect to every part. Doing so results in no ambiguity, and a construction that is supported by the plain language of the underlying agreements. The Cash

Lease Agreements did not alter the payment due date provision in the State Leases. Therefore, the payment of the grazing lease payment was due on or before April 1, 2020.

### i. The Plain Language of the State Leases is clear and provides for a Grazing payment due date of April 1.

The plain language of the State Leases provides:

The parties to this lease mutually agree to the following terms and conditions:

1. ALL GRAZING RENTALS ARE DUE BY MARCH 1 EACH YEAR AND <u>FAILURE TO PAY BY APRIL 1 AUTOMATICALLY CANCELS THE ENTIRE LEASE</u>. A NOTICE OF RENTAL DUE OR ANY OTHER CORRESPONDENCE OR NOTICE FROM THE LESSOR WILL BE SENT TO THE ABOVE ADDRESS ONLY, UNLESS A CHANGE OF ADDRESS IS REQUESTED IN WRITING, SIGNED BY THE LESSEE AND RECORDED BY THE LESSOR.

2. ALL AGRICULTURAL RENTALS ARE DUE ON NOVEMBER 15 OF THE YEAR IN WHICH CROPS OR HAY ARE HARVESTED IF THE RENTAL IS NOT PAID BY DECEMBER 31 OF THE SAME YEAR, THE ENTIRE LEASE IS CANCELED.

State Lease 447 (emphasis added).[15] The State Leases distinguish between acres being leased for grazing or agriculture. For example, State Lease 449 refers to 479.32 "Grazing Acres" and 155.76 "Agricultural Acres."[16]

There is a corresponding distinction when a grazing lease or agricultural lease payment is due. Paragraph 1 of the State Leases provides that "all grazing rentals are due by March 1 each year. . ." Whereas Paragraph 2 of the State Leases provides that "all agricultural rentals are due on November 15 . . ."[17] While agricultural rentals are due on November 15, the plain language of the State Leases indicates the grazing rental payments are due on March 1, with late payments due April 1 or the lease will be automatically cancelled. *Id.*

---

[15] State Leases 447, 449, 4351, and 6168 all have the exact same language. Ex. 1 of DNRC Cross Motion at ECF No. 52-4 (Lease 447); Ex. 2 of DNRC Cross Motion at ECF No. 52-5 (Lease 449); Ex. 3 of DNRC Cross Motion at ECF No. 52-6 (Lease 4351); and Ex. 4 of DNRC Cross Motion at ECF No. 52-7 (Lease 6168) (collectively "State Leases").

[16] Ex. 2 of DNRC Cross Motion at ECF No. 52-5 (Lease 449).

[17] State Leases 447, 449, 4351, and 6168 all have the exact same language. Ex. 1 of DNRC Cross Motion at ECF No. 52-4 (Lease 447); Ex. 2 of DNRC Cross Motion at ECF No. 52-5 (Lease 449); Ex. 3 of DNRC Cross Motion at ECF No. 52-6 (Lease 4351); and Ex. 4 of DNRC Cross Motion at ECF No. 52-7 (Lease 6168) (collectively "State Leases").

### ii. The Cash Lease Agreements do not alter the State Leases' Grazing Payment Due Date.

The Cash Lease Agreements state in part:

> This agreement is made and entered into by and between DUANE & JEANNE ANDERSON, hereinafter referred to as the Lessee and the Department of Natural Resources and Conservation hereinafter referred to as DNRC. <u>This agreement is supplemental to</u> and is incorporated by reference into State Lease # 449 to <u>any other amounts owed to the DNRC under the lease</u>, on approximately 116.55 acres located in Section 27, Township 35 North, Range 44 East, DANIELS County, Montana.

Cash Lease Agreements (emphasis added).[18] The other relevant provisions of the Cash Lease Agreements are:

> (1) <u>The annual cash amount</u> for including State lands in the CRP program, set forth herein, <u>is owed</u> by the Lessee to the State, <u>in addition to all other payments set forth in the Lease Document, including but not limited to grazing</u> and crop share <u>payments</u>.
> . . .
>
> (9) Through this Agreement, the Lessee understands that <u>the annual cash rental payment will be due and payable on or before November 15th of each year.</u> All payments will be made to the DNRC.
> . . .
> (13) <u>All other terms and conditions of the lease remain unchanged and in effect.</u>

Cash Lease Agreements (emphasis added). The "annual cash amount" or Cash Lease Payment is the amount Andersons agreed to pay DNRC to enroll the acreage leased for agricultural purposes in the CRP program. This payment was "in addition to" all other payments due under the State Lease.

Andersons argue "DNRC and Andersons expressly agreed that the annual rental payments on the State Leases 'will be due and payable on or before November 15th of each year.'" Andersons focus on paragraph 9 of the Cash Lease Agreements which states: "Through this Agreement, the Lessee understands that the annual cash rental payment will be due and payable on or before November 15th of each year. All payments will be made to the DNRC." This interpretation considers paragraph 9 in isolation without regard to the other provisions or subject matter of the State Lease and Cash Lease Agreements.

Andersons' argument ignores the distinctions between the grazing, agricultural, and Cash Lease payments. In essence, the parties' agreements involve at least 3 distinct payments: a

---

[18] There are five Cash Lease Agreements that all contain the exact same language, except for the reference to the State Lease(s) to which they apply. ECF No. 51-12 pp. 1-2 (Cash Leases for State Lease # 449; ECF No. 51-12 pp. 3-4 (Cash Leases for State Lease # 4351); ECF No. 51-12 pp. 5 (Cash Lease for State Lease # 6168).

payment for acreage leased for grazing; a payment for acreage leased for agriculture; and the payment for acreage enrolled in the CRP program. Each payment had a specific due date. Nothing in the Cash Lease Agreement modified the grazing rental payment due date.

Andersons' interpretation of the Cash Lease Agreements and the construction they urge this Court to adopt ignores the plain language of provisions which undermines their position. The Cash Lease Agreements expressly state that they are "supplemental to . . . any other amounts owed to DNRC under the lease." The plain language of the Cash Lease Agreements makes clear that "the annual cash amount . . . is owed . . . in addition to all other payments set forth in the Lease Document, including but not limited to grazing and crop share payments." Finally, the Cash Lease Agreements maintain that "all other terms and conditions of the lease remain unchanged and in effect." Andersons' argument does not interpret the lease holistically, (each clause helping to interpret the other). Instead, Andersons have constructed an argument that selectively focuses on limited provisions, while ignoring others.

Taken as a whole, the provisions of the Cash Lease Agreement require that, while the annual cash payment is due on or before November 15 each year, the grazing lease payments due under the State Leases remain due on or before April 1. The Andersons' self-serving reading of the provision relating to the due date for the annual cash rental payment and applying it to grazing lease payments due under the State Leases cannot be reconciled with the other provisions of the Cash Lease Agreement which require that the annual cash rental payments are to be made "in addition to" other payments under the State Leases "including but not limited to grazing . . . payments." This Court will not selectively choose which provisions of the Cash Lease Agreements apply. *Corwin*, 898 P.2d at 1231. ("[C]ourts are without authority to erase components from unambiguous contract provisions.").

The agreements at issue are not ambiguous. This Court will not read ambiguity into the Cash Lease Agreements merely because the parties disagree as to the interpretation of certain provisions therein. *Mary J. Baker Revocable Trust*, 164 P.3d at 857. "[A]n ambiguity's existence must be determined on an objective basis." *Wicklund*, 367 P.3d at 408. Objectively, the Cash Lease Agreements do not alter the due date for grazing lease payments under the State Leases. At best, Andersons' have contrived an ambiguity where none exists. The Court notes Andersons regularly submitted their grazing rental payment at the end of March, and never in November. For more than 10 years, Andersons tendered their grazing lease payment by April 1. Affidavit of Duane Anderson at ECF No. 1-4, ¶¶ 8-9. Andersons' course of conduct prior to the State's termination of the leases is difficult to reconcile with their argument now that an ambiguity exists in the State Lease. The parties' conduct demonstrates both understood the grazing lease payment was due on or before April 1, 2020.

Finally, the provisions of the Cash Lease Agreements indicate the mutual intent of the parties to leave the grazing lease payment provisions of the State Leases intact. Mont. Code Ann. § 28-3-303.[19] The Court does not need to consider extrinsic evidence regarding the intent of the parties. *Id.* The intent of the parties to have the Cash Lease Agreement and the rents due

---

[19] "[W]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible[.]"

thereunder in addition to the grazing payments due under the State Leases is clear from the plain language of the Cash Lease Agreements.

The plain language of the Cash Lease Agreements along with the State Leases weighs in favor of only one conclusion —the Cash Lease Agreements did not alter the due date for the grazing lease payments set forth in the State Leases. Therefore, the grazing lease payment was due on or before April 1, 2020.

### B. The United States was not a lessee, nor was it involved as a lessee.

The Andersons' alternative argument that the grazing lease payment was due on December 31, 2020, hinges on whether the United States was a lessee, or involved as a lessee. This argument is premised on Mont. Code Ann. 77-6-506(1) which provides:

> (1) For a grazing lease, for the grazing portion of a lease containing both agricultural and grazing land, and for agricultural leases not based on a crop share, the grazing rental for the first year of the lease must be paid at or before the time of the execution of the lease; however, in the case of a lease that takes effect on and after October 1 and before the expiration of the coming February, both the rental for the fractional year and for the next full year beginning March 1 must be paid and collected at the time of issuing the lease. <u>If the United States is the lessee of state lands for grazing purposes, the rental is payable at the end of each year of the lease. The rental for each succeeding year</u> on a lease issued after July 1, 1999<u>, with the exception of a lease that involves the United States as the lessee, is due and payable before March 1. If the rental is not paid before March 1, a $25 penalty must be imposed on the lessee. If the full rental and the $25 penalty are not paid by April 1, the entire lease is canceled.</u>

(emphasis added). The Andersons assert that the United States was a lessee or involved as a lessee, and accordingly, the grazing rental was due at the end of the year, on or before December 31, 2020.

The Andersons proffer three alternative arguments that the United States was a lessee or involved as a lessee. First, despite the State Leases and Mont. Code § 77-6-208(1) requiring DNRC approval for a valid assignment, Andersons argue that by granting a security interest in the State Leases to USDA, they validly assigned the State Leases to USDA, and the United States became a lessee. Second, they argue that by filing the Assignment Forms with DNRC in compliance with Mont. Admin. R. § 36.25.122, an "effective" assignment occurred, making the United States a lessee. Finally, the Andersons argue that but for the DNRC's failure to notify the USDA of the Andersons' alleged default, the USDA would have asserted its rights to protect its collateral by assuming the State Leases and therefore would have been a lessee. Each of these arguments are flawed.

### i. The United States was not a lessee because DNRC did not approve assignment to the USDA as required by the State Leases.

At the outset the Court notes, "[t]he fundamental tenet of modern contract law is freedom of contract; parties are free to mutually agree to terms governing their private conduct as long as those terms do not conflict with public laws." *Arrowhead School Dist. No. 75, Park County v. Klyap*, 79 P.3d 250, 256 (Mont. 2003). Although the State Leases allow the leases to be assigned, the parties agreed that any assignment must be approved by DNRC. The assignment language in the State Leases mirrors language found in Mont. Code Ann. § 77-6-208.

The assignment of lease provision of the State Leases is as follows:

> 11. ASSIGNMENT OF LEASE--If all rentals due have been paid and the terms of this lease have not been violated, the lease may be assigned on the forms provided for that purpose by the Director, but no such assignment shall be binding on the state unless the assignment is filed with the Director, approved by him, and the appropriate assignment fees submitted for such assignment. An assignment which is signed by both parties shall be conclusive proof that all payments for improvements have been paid to the assignor by the assignee. The leasehold interest herein may only be transferred to any other party by a properly executed assignment which must be approved by the Director prior to such transfer becoming effective. Until an assignment becomes effective, the Department will consider the lessee listed above to be the lessee for all purposes. There may be no consideration given for the assignment of a lease other than the value of the improvements, if any.

State Leases (emphasis added).[20] The State Leases mirror the language of Mont. Code § 77-6-208(1) which requires assignments to be "filed with the department and approved by it" to be valid. Accordingly, absent conflict with the applicable code section, the provisions of the State Leases control the Court's analysis.

The State Lease assignment provision expressly sets forth that "no such assignment shall be binding on the state unless the assignment is filed with the Director, approved by him, and the appropriate assignment fees submitted for such assignment." This provision requires the state approve an assignment for it to be valid. Moreover, it does not conflict with Mont. Code Ann. § 77-6-208 which provides that "an assignment is not binding on the state unless the assignment is filed with the department and approved by it and payment made of the assignment fee[.]" Since the State Lease assignment provision does not conflict with public law, the contract controls. *Arrowhead School Dist. No. 75, Park County*, 79 P.3d at 256.

---

[20] Ex. 1 of DNRC Cross Motion at ECF No. 52-4 (Lease 447); Ex. 2 of DNRC Cross Motion at ECF No. 52-5 (Lease 449); Ex. 3 of DNRC Cross Motion at ECF No. 52-6 (Lease 4351); and Ex. 4 of DNRC Cross Motion at ECF No. 52-7 (Lease 6168).

Here, the Assignment Forms were not signed by the Director or the DNRC. Meaning, any assignments of the State Leases to the USDA were not valid. As a result, the United States was not a lessee nor involved as a lessee. Accordingly, the grazing rental payment due date set forth in the State Leases was not altered. Therefore, the grazing rental payment was due on or before April 1, 2020. The Court's analysis could stop here, but for the sake of thoroughness, it will address the various alternative legal arguments set forth in the Andersons' Response to DNRC Cross Motion.

> ii. **The USDA's recordation of its security interests in the State Leases did not make the United States a lessee.**

The Andersons' argument that USDA's recordation of its security interest in the State Leases made the United States a lessee is not persuasive. The Montana Code and associated regulations require the USDA, or other party with a security interest in a state lease, to "foreclose" on the lease in order to have the lease validly transferred to it. Mont. Code Ann. § 77-6-403; Mont. Admin. R. § 36.25.118. The Andersons' interpretation of Mont. Admin. R. § 36.25.122 is not sufficient to overcome the requirements of Mont. Code Ann. § 77-6-403. *See Clark Fork Coalition v. Tubbs*, 380 P.3d 771, 777-79 (Mont. 2016).

Generally, the plain language of a statute controls and any conflicting administrative rules or regulations lack effect. *Clark Fork Coalition*, 380 P.3d at 777 ("a statutory term is not rendered ambiguous because of subsequent inconsistent rules implemented by the agency."). This is because "a rule is not valid or effective unless it is: (a) consistent and not in conflict with the statute; and (b) reasonably necessary to effectuate the purpose of the statute." *Id.* at 779 (quoting Mont. Code Ann. § 2-4-305(6)).

Mont. Admin. R. § 36.25.122 states:

(1) <u>As provided in 77-6-401 through 77-6-404, MCA, state land leases</u> or licenses and leasehold interests <u>may be pledged or mortgaged by the lessee</u> or licensee. The pledgee or mortgagee shall file the pledge or mortgage or certified copy thereof with the department within 30 days of its receipt by him. Within 30 days after payment of the indebtedness, termination of the pledge agreement, or release of the mortgaged leasehold interest, the lessee or licensee shall file proof of that fact with the department.
(2) If a lessee or licensee mortgages his leasehold interest in state lands pursuant to 77-6-401, MCA, then <u>there must be an assignment, signed by the lessee or licensee/mortgagor and the mortgagee, and placed in escrow. A copy of such escrow assignment must be filed with the department. An assignment is effective for the lease term during which it is made and any subsequent renewal term as long as the assignor continuously holds the lease. Failure to execute the terms of this rule shall be cause for the department not to recognize the mortgage.</u>

(emphasis added). The qualification "as provided in 77-6-401 through 77-6-404, MCA" indicates this regulation relates to the mortgaging of state leases as set forth in those code sections.

12

Looking to Mont. Code Ann. § 77-6-403, the Court finds language requiring proof of "foreclosure or conveyance" of the mortgagor's leasehold interest for the land board to transfer the lease to that person. Specifically, the statute states, "upon due proof that a person has acquired through <u>foreclosure or conveyance</u> the pledgor's or mortgagor's leasehold interest, the board shall transfer the lease to that person, who is subject to all the conditions, obligations, and liabilities and entitled to all the rights and privileges provided for in the lease." Mont. Code Ann. § 77-6-403(1) (emphasis added).

The Andersons' reading of Mont. Admin. R. § 36.25.122(2) conflicts with the statute and is not reasonably necessary to effectuate the purpose of the statute. The Andersons reading of the administrative rule assumes that the mortgagee, USDA, had an effective assignment merely by filing the assignment in escrow, which conflicts with Mont. Code Ann. § 77-6-403's requirement of foreclosure on the lease to validly transfer the lease rights and obligations. Additionally, Mont. Admin. R. § 36.25.122(2) is a superfluous and not reasonably necessary to effectuate the purpose of the related statute Mont. Code Ann. § 77-6-402. That statute requires the mortgagee of a state lease file a copy of the mortgage with the department. Mont. Code Ann. § 77-6-402. The administrative rule simply restates that statutory requirement of notifying DNRC and adds the language regarding the assignment being "effective" for the term of the lease.

Moreover, reading the entirety of Mont. Admin. R. § 36.25.122(2), it becomes clear that the assignment escrow requirements of the rule are simply notice requirements in place to give the DNRC notice that a party has taken a security interest in the leases. The last sentence of the rule states that "[f]ailure to execute the terms of this rule shall be cause for the department not to recognize the mortgage." Recognition of the existence of the mortgage is distinct from approval of the mortgagee as a lessee.

Finally, the plain language of Mont. Admin. R. § 36.25.122(2) indicates that the use of the phrase "[a]n assignment is effective" references the duration of the effectiveness of assignment, not the requirements for effective assignment. The phrase in full states: "[a]n assignment is effective for the lease term during which it is made and any subsequent renewal term as long as the assignor continuously holds the lease." Mont. Admin. R. § 36.25.122(2). This does not set forth requirements that must be met for an effective assignment. It merely describes how long an assignment will be effective. The applicable administrative rule, setting forth requirements of assignment, is located at Mont. Admin R. § 36.25.118(1) which is titled "Assignments" and states that "[a]n assignment in order to be binding on the state must be approved by the department."

Since the USDA did not foreclose on the State Leases as required for valid transfer under Mont. Code Ann. § 77-6-403 the United States was not a lessee. The Andersons' reading of Mont. Admin § 36.25.122(2) cannot be reconciled with the remaining portions of the rule, the applicable administrative rule, nor the controlling statute. As such, this Court cannot conclude the United States was a lessee or involved as a lessee.

13

### iii. The DNRC's failure to notify the USDA of the Andersons' alleged default did not make the United States a lessee nor did it make the United States involved as a lessee.

The Andersons final attempt to shift the grazing lease payment due date rests on the premise that the USDA would have assumed the lease if it had been given proper notice. The argument could be construed as a concession that USDA did not have a valid assignment. Yet, to adequately dispose of this argument the Court must only look so far as the Security Agreements between Andersons and the USDA.[21]

Under the Security Agreements, the Andersons grant security interests in the State Leases to USDA. Notably, provision 3(e) of the Security Agreements requires the Andersons to notify the USDA of any material change in the collateral including any event of default. ECF No. 17-7 p. 42. The Security Agreements also grant the USDA the right to preserve its collateral by making payments on the State Leases. *Id.* (Security Agreement provision 3(f)).

While the USDA had the "right" to preserve its collateral, it did not do so. Without taking action to preserve is collateral and assuming the obligations of the lease, the USDA simply retained a right to assume the leases, but it had not exercised that right. Without exercising that right, the USDA did not assume the leases and was not a lessee.

Finally, the Andersons' argument that the USDA would have assumed the lease had DNRC notified the USDA of the Andersons' alleged default, misses the mark. It was the Andersons, not DNRC, that were required to notify the USDA of any material changes to the State Leases. The Court cannot conclude that the DNRC's failure to notify the USDA of the Andersons alleged default transformed the United States from a secured creditor to a lessee.

### V. Conclusion

Based on review of the briefing in this matter, appropriate evidentiary material, and applicable law, the grazing lease payment due date of the State Leases was not altered by the Cash Lease Agreements, nor were the State Leases the types of leases in which the United States was a lessee or involved as a lessee. Accordingly, the grazing lease payment was due on or before April 1, 2020. As such,

IT IS ORDERED that the Andersons' Motion is denied.

IT IS FURTHER ORDERED that the DNRC Cross Motion is granted.

IT IS FURTHER ORDERED that although this decision determines the payment due date, the issue of whether the cancellation of the State Leases was valid, and the parties'

---

[21] Each of the three Security Agreements grant USDA security interests in all four State Leases (447, 449, 4351, and 6168). Security Agreement dated Jan. 1, 2010, ECF No. 17-7 pp. 37-44; Security Agreement dated Jan. 1, 2009, ECF No. 17-7 pp. 45-52; Security Agreement dated Dec. 23, 2004, ECF No. 17-7 pp. 53-60.

14

respective interests in the Leases has not been adjudicated and is reserved for trial or further motions.

Dated June 1, 2022.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana